UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| United States of America,<br><br>               Plaintiff,<br><br>vs.<br><br>Jovan Marquis Harris,<br><br>               Defendant. | Case No.:  3:16-cr-00272<br><br><br>**DEFENDANT'S BRIEF IN SUPPORT OF RULES 29 & 33 MOTIONS** |

## INTRODUCTION

In this case, Defendant, Jovan Marquis Harris ("Mr. Harris"), faced charges for Count 1 – Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance Resulting in Serious Bodily Injury and Death (Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2); Count 2 – Distribution of a Controlled Substance Resulting in Death (Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2); Count 3 - Distribution of a Controlled Substance Resulting in Serious Bodily Injury (Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2);  Count 4 - Distribution of a Controlled Substance Resulting in Serious Bodily Injury (Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2); Count 5 - Distribution of a Controlled Substance Resulting in Serious Bodily Injury (Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2); Count 6 - Distribution of a Controlled Substance (Title 21, United States Code, Sections 841(a)(1) and Title 18, United States Code, Section

2361609.1

2); and Count 7 - Distribution of a Controlled Substance (Title 21, United States Code, Sections 841(a)(1) and Title 18, United States Code, Section 2). On May 7 through May 14, 2018, a criminal jury trial was held. Following trial, the jury ultimately convicted Mr. Harris of Count 1 - Conspiracy – resulting in death of J.W.L., resulting in serious bodily injury of T.P.M. and resulting in serious bodily injury of M.S.M; Count 2 – Distribution of heroin, resulting in the death of J.W.L.; Count 3 – Distribution of heroin, resulting in the serious bodily injury of T.P.M.; Count 5 – Distribution of heroin, resulting in the serious bodily injury of M.S.M.; Count 6 - Distribution of heroin; and Count 7 – Distribution of heroin. On May 16, 2018, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, Mr. Harris filed Motions for Acquittal and New Trial related to this case. See Docs. ##98 & 99. Mr. Harris requested additional time to submit written briefs in support of said Motions. See Doc. #102. On May 18, 2018, the Court entered an Order granting Mr. Harris thirty (30) days from the date of the Order to submit written briefs in support of the Motions. Mr. Harris now files the instant Brief in Support of the Motions for Acquittal and New Trial. For the reasons set forth herein, Mr. Harris respectfully requests the Court grant Mr. Harris' Motion for Acquittal, or in the alternative, grant Mr. Harris's Motion for New Trial.

## **STATEMENT OF FACTS**

A.   Pre-Trial Issues

On November 16 2016, an Indictment was filed against Mr. Harris. See Indictment Doc. #1. Specifically, the Indictment alleged that Mr. Harris committed the offenses of Count 1 - Conspiracy – resulting in death of J.W.L., resulting in serious bodily injury of T.P.M. and resulting in serious bodily injury of M.S.M; Count 2 – Distribution of heroin, resulting in the death of J.W.L.; Count 3 – Distribution of heroin, resulting in the serious

2361609.1

bodily injury of T.P.M.; Count 5 – Distribution of heroin, resulting in the serious bodily injury of M.S.M.; Count 6 - Distribution of heroin; and Count 7 – Distribution of heroin.  On November 28, 2016, Mr. Harris was arrested on the Indictment and an Initial Appearance was held in the District of North Dakota before the Honorable Magistrate Judge Senechal.  See Minutes Doc. #7 on November 29, 2016.  Attorney Ronald K. Hettich was appointed to represent Mr. Harris.  See Doc. #9.  Mr. Harris' custody was maintained.  See Doc. #13.

On March 21, 2017, Mr. Hettich filed a Motion to Withdraw as attorney for Mr. Harris.  See Doc. #28.  On April 3, 2017, current counsel for Mr. Harris, Kenneth J. Kohler, was appointed to represent Mr. Harris.  See Doc. #33.  Eventually, trial for Mr. Harris was scheduled for May 7, 2018.  On February 15, 2018, Mr. Harris filed a Motion in Limine, along with a Memorandum in Support of the Motion, requesting that the Court exclude any and all evidence and to dismiss the indictment against him.  See Doc #63.  On March 8, 2018, the Hon. Judge Bennett entered an order denying the Pro Se Motion.  See Doc #68.  On April 23, 2018, Motions to exclude evidence were filed on behalf of Mr. Harris, to exclude any testimony relating to Zachary Speaker, and any reference to anonymous phone calls received by law enforcement personnel.  Trial commenced on the afternoon of June 6, 2017.  On the first day of trial, Hon. Judge Bennett ruled on the motion to exclude evidence, as well as motions relating to exhibit disclosure made by the government and the defense.  First, the Court overruled a government objection, ruling the government was precluded from using statements received from Zachary Speaker, based upon Mr. Speaker's unavailability, as he was deceased and use of his statements would constitute hearsay and violate Mr. Harris' confrontation rights.  This ruling was modified during trial to allow the government

to utilize a statement obtained from Mr. Speaker to verify his location in a vehicle at the Stamart gas station with the decedent, Jordan Larry, prior to his death.  Second, the Court overruled a government objection, ruling the government was not allowed to use the anonymous phone calls received identifying Mr. Harris as having been involved in Jordan Larry's death as this would constitute hearsay and violate Mr. Harris' confrontation rights. The Court did allow the government to use the existence of anonymous phone calls to show how they focused on Mr. Harris as a suspect in the case.  Third, the Court overruled a government objection, ruling that certain medical reports relating to Tyler McIntosh, and his alleged overdose, not be allowed in the government's case on the basis that the government had not timely obtained and disclosed the reports prior to trial.  This ruling was also modified to allow the government to utilize the medical reports to refresh a witness' recollection.  This modification allowed the government to identify the medical reports, allowed the witness to recite provisions off of the report, and further allowed the government to mention the medical reports being used to refresh recollection in their closing argument before the jury. Fourth, the Court overruled an objection by Mr. Harris that photographs taken from Mr. Harris' cell phone depicting Mr. Harris holding large amounts of currency, could be used by the government to argue that Mr. Harris was involved in the sale of drug activity.

      B.    <u>Trial Testimony and Evidence</u>

        1.    *Agent Chris Martin, DEA Task Force Officer*

The trial began with testimony from Agent Chris Martin ("Agent Martin"), with the DEA Task Force.  Agent Martin commenced his testimony by describing his response to the emergency call of the overdose and death of Jordan Larry.  He described efforts to preserve the scene of the death, which included photographing the scene and different aspects of the

2361609.1

decedent.  He described custody of the body and its transport to the medical examiner in Ramsey County, Minnesota.  Agent Martin submitted photographs of the decedent, the area of the home which was believed to be the area in which Jordan Larry died.  He also submitted photographs of Jordan Larry's wallet contents, which included foil packets containing heroin, one opened and one still enclosed.  Agent Martin speculated that Mr. Larry had overdosed with the use of the heroin contained in the opened foil packet.  Mr. Larry's wallet contained no cash of any kind.  Agent Martin also identified a cell phone that was found at the scene and identified it as belonging to and being used by Jordan Larry. Attempts to "open" this cell phone were made, but due to the phone being password protected, the opening of the phone to retrieve text messages, photographs and other contents had been unsuccessful.  Agent Martin did testify that he had been able to retrieve call information from the cell phone company so that contact information used by the phone had been recovered, but that the actual call or text content could not be retrieved.

Agent Martin testified that Mr. Larry had a criminal background and was a known heroin user and seller, and that he had been part of the drug task force, and had attempted to purchase heroin from Mr. Larry on a prior occasion, but that this effort had been unsuccessful.

Agent Martin testified that his investigation into the cause of Jordan Larry's overdose and death concentrated on an 18-hour window prior to his death.  He opined that normal heroin addicts, which he believed Mr. Jordan to be, would purchase their heroin and immediately use the entire quantity of heroin they had obtained.

Agent Martin testified that he had contact with Alexa Centers, who provided a

statement that contained her contacts with Mr. Larry the day before his death. He was able to confirm her contact with Mr. Larry, by a video tape of their meeting at the Dairy Queen in Moorhead, MN. Agent Martin testified that he learned from Ms. Centers that she was a heroin addict and obtained her heroin through Mr. Larry which was arranged through text messages and phone calls transmitted between the two. Agent Martin testified that through his contact with Ms. Centers, she indicated that she would accompany Mr. Larry on trips to obtain his heroin from his "source." Agent Marin testified that he learned that the "source" drove a Silver Chrysler 300.

Agent Martin testified that, through his investigation, he had obtained a video of the Stamart gas pump area in North Fargo. He was able to testify that through his contacts with Mr. Zachary Speaker (deceased) he had learned that Mr. Larry had traveled to the Stamart gas station in Mr. Speaker's father's blue car. Agent Martin played the video for the jury, and pointed out that the blue car waited in the parking lot (just off camera). While parked in the lot, a Silver Chrysler 300 came into the lot and appeared to park next to the blue car. Agent Martin opined that a drug exchange occurred between Mr. Larry in the blue car, and a person in the Silver Chrysler 300, although any interaction between the individuals in both cars happened off-camera and could not be observed. Still shots of the Silver Chrysler were admitted, and Agent Martin opined the vehicle plates, although very blurred, were from Wisconsin, despite admitting that several other state plates were similar and that there are several other vehicles in close proximity to the blue car and could have had interaction with its occupants. Agent Martin admitted that the blue car, in leaving the StaMart parking lot was headed in a direction towards a nearby residence where Jacob Wetch resided and that

6

through Agent Martin's prior investigation of Jordan Larry, it was known that Jacob Wetch had sold heroin to Jordan Larry prior to this date.

Finally, Agent Martin testifies that he has done an analysis of Mr. Larry's cell phone to examine its data base for the purpose of determining who Mr. Larry had contact with by cell phone during the last 18 hours of his life.  Agent Martin identifies known cell phone numbers of Alexis Centers and Zach Speaker, and notes contacts that Mr. Larry had with each.  He then identifies the cell phone number that Jovan Harris supplied to the Cass County Jail as a contact number in his booking information in July, 2015.  A visual is admitted into evidence showing several calls between this number and Mr. Larry's cell phone.  Agent Martin admits that there are hundreds of calls to other numbers that were not identified or investigated, and that while his examination shows these limited contacts were made with Jovan Harris, there is no evidence of the content of the text or phone calls.  There is no evidence showing that Jovan Harris received or even participated in calls/texts, and no evidence to show the calls/texts, if they existed, involved any illegal activity.

2.      *Deputy Myron Canales, Cass County Sheriff's Department*

Dep. Myron Canales ("Dep. Canales") testified that he was the arresting officer who came into contact with Mr. Jovan Harris in July, 2015.  He testified that during a booking of Mr. Jovan Harris in July, 2015, a booking sheet was generated and listed a telephone number as his contact number.  This number was utilized by task force members to link Jovan Harris to Jordan Larry, through phone/text contacts.  Deputy Canales admitted that this number was not linked to Jovan Harris in any other manner, and could have been anyone's number. There was no other information about the number provided, including who the number was

2361609.1

listed to, who utilized the number or who may have had access to it.

### 3.    Agent Brad Stuvland

Agent Brad Stuvland ("Agent Stuvland") testified that he was part of the team that assisted in the death investigation of Mr. Jordan Larry.  Agent Stuvland testified that he was tasked in retrieving and reviewing a video tape from the interior of the Dairy Queen in Moorhead, Minnesota which was taken the night before Mr. Larry's death.  He was able to retrieve and play for the jury a 15 minute segment of the Dairy Queen surveillance camera footage which showed a person identified as Mr. Jordan Larry, meeting with Ms. Alexa Centers and a person identified as Mr. Zachary Speaker.  This video, along with several still shots from the video were admitted into evidence, and while this video showed Mr. Speaker was in the Dairy Queen with Jordan Larry, there were no shots that showed the two coming in together, sitting together or leaving the store together.

### 4.    Alexis Centers

Alexis Centers ("Ms. Centers") is called to testify.   She states she has prior convictions for Forgery, Controlled Substance Possession, False Information to a Police Officer and Conspiracy to Distribute Methamphetamine (sale).  Ms. Centers testified that around 2013 she was utilizing a number of dealers to obtain heroin, including Jacob Wetch and Brandon Jacobs.  She stated that in 2015, during the last months of Mr. Larry's life, she would pick Mr. Larry up, so he could be the middle man in obtaining heroin.  The process normally had Ms. Centers contacting Mr. Larry to see if he could get heroin for her.  He would respond, and they would either meet or she might pick Mr. Larry up to go and get the heroin.  Ms. Centers stated they would often go to 8th Street in North Fargo and meet at places like the Hornbacher's grocery store or elsewhere.  Ms. Centers stated that they would

often meet with the supplier who was traveling in another car.  She almost never saw the supplier, just the car he was traveling in.  Ms. Centers stated she thought the vehicle was a Chrysler.  She stated Mr. Larry would often identify his supplier as "dude."  Ms. Centers stated she never observed the "supplier" except on one occasion when they were to meet the supplier at another location.  She waited in her vehicle with Mr. Larry, and observed a young black male approach her vehicle.  She believes the male thought Mr. Larry was alone in the vehicle, because when he saw her in the passenger seat, he immediately turned and walked in the other direction.  Ms. Centers identified this male as young, black, with braided hair, with a very slight build.  She described him as being tiny, even shorter than her.  She testified that she was 5 foot 4 inches tall, and that this person was shorter (it should be noted that Mr. Jovan Harris is much taller than 5'4").

On the night before Mr. Larry's death, Ms. Centers texted Mr. Larry to see if he could obtain heroin for her.  He responded that he could, and asked her to meet him.  Ms. Centers said she received a number of texts from Mr. Larry saying that he was "with the dude" and that she should meet with them.  He then responded with a text that he and "the dude" were going to be waiting for her to arrive.  At around 6:00 or 7:00 p.m., Ms. Centers said she met with Mr. Larry at the Dairy Queen.  She stated Mr. Larry was with another white "hippy" looking male, believed to be Zachary Speaker.  No one else was with Jordan Larry.  Ms. Centers stated she provided $150 to Mr. Larry and he provided her about a ½ gram of heroin. She stated it was in a tin foil (she stated all the heroin she received from Mr. Larry was in foil) and was purplish in color and rocklike in texture.  It should be noted that the heroin that was believed to have caused Jordan Larry's overdose did not match this description, but was

gray in color, and is not described as being rocklike in texture.  Ms. Centers believes Mr. Larry was traveling with the other male in a blue car.  Ms. Centers testified that they made the exchange and then left the Dairy Queen.  She did not see Mr. Larry again, and heard about his death on Facebook.

Ms. Centers during a pre-trial meeting with law enforcement personnel was shown a lineup that contained a picture of Jovan Harris, and asked whether she recognized anyone in the lineup.  Ms. Centers testified that even though she had seen the "supplier" on five different occasions, she could not recognize anyone in the lineup as being the supplier, and Jovan Harris was among the photos in the lineup.  She was asked in the open courtroom if she could identify Jovan Harris as the "supplier" providing heroin to Mr. Larry.  Again, Ms. Centers testified that she could not identify him as such.

5. *James Smith*

Next, Mr. James Smith ("Mr. Smith") testified.  Mr. Smith was an admitted felon with multiple convictions for drug possession and sale.  He had previously done prison time for his convictions and had also gone through drug court for possession of marijuana and possession with the intent to sell methamphetamine.  He lives in North Fargo at 2015 8th Street North, right next to the Hornbacher's grocery store.  Mr. Smith stated he didn't get much into drugs until he met Mr. Jacob Wetch, another of the government's witnesses.  He met Mr. Wetch on the street and was selling some weed (marijuana), which he admittedly was smoking.  Mr. Smith testified that he was asked by Mr. Wetch whether he was interested in selling heroin.  At the time, Mr. Smith indicated that he was not into heroin and refused.  Mr. Smith stated that when the task force initially contacted him, they informed him that they

wished to speak with him about Jovan Harris.  Mr. Smith told the task force that he did not know that person.  The task force informed Mr. Smith that they were conducting an investigation that would lead to federal indictments.  Task force members informed Mr. Smith that a conviction, even with no prior convictions, would yield a 20 year mandatory minimum prison sentence.  Task force members told Mr. Smith that this was his chance to be "on the right side" to avoid a federal indictment.  Mr. Smith, faced with serious threats involving prolonged incarceration, was then shown a picture of Jovan Harris.

Mr. Smith, confronted with these threats, changed his position.  During his initial interview with the task force, Mr. Smith indicated the person he dealt with was named, "Peter."  Only after law enforcement personnel informed him the person was named Jovan Harris and had a nickname of "P" did Mr. Smith admit that he was aware of some drug activity.  He testified that sometime in 2015, he was at Hornbacher's grocery store and was meeting with Brazil Midell, Mr. Harris' brother, for the purpose of selling him some marijuana.  He stated that he never really met "Pooh" but sold Brazil Midell some marijuana while "Pooh" stayed in the car.  Mr. Smith stated that he knew Jacob Wetch who agreed to help him sell heroin.

Mr. Smith said that he got "a little bit" of heroin from some women who said it was from "P."  He described four (4) deliveries over the next two (2) months.  He estimated getting a total of no more than 10 grams of heroin which he sold for $300-400 per gram.  Mr. Smith said that he didn't know where the heroin was coming from.  And he didn't know whether the heroin was really coming from Jovan Harris or not.  Mr. Smith testified that the heroin would be dropped off by two girls, one of which he thought was Asian and the other

2361609.1

white.  Mr. Smith testified that he was informed the girls were from Minneapolis and that this is where the drugs were coming from.  All the arrangements were made by phone by a person who he believed was also from Minneapolis, but Mr. Smith admitted that he had no idea who the person really was.  The girls would bring him the heroin, and he would cut it into smaller packages.  He would then contact Jacob Wetch who would take and sell a majority of the drug.  Mr. Smith said he never met with the source and never spent any time with him.  Other government witnesses contradict this claim by testifying that they saw the source with Mr. Smith at his residence and hung out with them.

Mr. Smith admitted that he has sold drugs to most of the government's witnesses, including Jacob Wetch, Tyler McIntosh, Morgan Masters, among others.  Mr. Smith denied ever selling drugs to Jordan Larry, or having any knowledge of any person having an overdose that he dealt with.

### 6.    Derek Pettersson

Next, Derek Pettersson ("Mr. Pettersson") testified.   Mr. Pettersson was also an admitted drug addict.  He admitted that he had convictions from 2009, 2011, 2013, 2015 and 2016.   His convictions were mostly drug offenses:   Criminal Conspiracy involving marijuana, Felony Delivery of Drugs, Felony Possession of Paraphernalia and Possession of Drugs, along with a felony theft conviction.  He also stated he had been through inpatient drug treatment and was currently on a methodone program which was allowing him to take prescribed drugs to try and defeat his heroin addiction.

Mr. Pettersson, during cross-examination, stated the task force had come to him to provide information relating to Jovan Harris.  Mr. Pettersson testified that he had to consult

with two unknown people from the street to inform him about what he knew about Jovan Harris, and that he had no independent knowledge about him.  Mr. Pettersson, when asked about Jovan Harris, initially thought his nickname was "Tai" or "Little T", and didn't recognize the name Jovan Harris, or his nickname of "Pooh" until suggested by the interviewing officer.   He went on to testify about events that dated back in the summer of 2015.  He indicated that he was a heavy heroin user, and if he didn't use every 8-10 hours, he would go into withdrawals.  He testified that he received his drugs regularly through Jacob Wetch, whom he considered a good friend.  Mr. Pettersson said that he used Jacob Wetch as his middleman source for over a month and a half, calling him and getting drugs from him every day during that period (over 45 times).  He testified that he did this because Jacob Wetch was "on point", meaning his drugs were always good and he was steady and consistent in providing him heroin.  Mr. Pettersson testified that the procedure was about the same each time he got drugs from Jacob Wetch.  He would call Jacob Wetch who would come and pick him up.  They would then drive to the "source" where Mr. Wetch would get the heroin and bring it back to Mr. Pettersson.  Occasionally, Mr. Petterson said that Jacob Wetch would pick up the "source" and bring him to where Mr. Pettersson was to conduct the drug transaction.  Often times, this transaction would occur on 8th Street in North Fargo (in the same location where Mr. Smith lived).  Mr. Pettersson stated he believed the "source" was Jovan Harris.  Mr. Pettersson said that he observed Jovan Harris on each of the drug transactions through the car windows, but when confronted on cross-examination, admitted that he wasn't completely sure.  Mr. Pettersson also said there were occasions when Jacob Wetch had to go into the residence on 8th Street in North Fargo, where he couldn't see.  This

2361609.1

is the same location where James Smith resided, and has never been a residence for Jovan Harris.  Per Mr. Pettersson's testimony, he met and worked with Jacob Wetch every day for over 45 days, although this is denied by Mr. Wetch and others.  Mr. Pettersson said this ended after the month and a half when he chose to steal drugs from Jacob Wetch.  He described taking the heroin and driving away without paying for it.  Mr. Pettersson said Jacob Wetch, with someone he assumed was Jovan Harris, drove after him, and threw tools at his vehicle.

Mr. Pettersson admitted that he knew the decedent, Jordan Larry, and that he received a call from Mr. Larry the day before he died.  He said Mr. Larry told him that "some guys" were looking for him, and had offered Mr. Larry money to tell them where he, Mr. Pettersson, lived.  Mr. Pettersson said he "thinks" that was Jovan Harris.  On cross-examination, Mr. Pettersson admitted that he had stolen drugs from at least ten (10) different people and that he was not sure who had called to get information on him.

Mr. Pettersson also described an incident when he was in the Cass County jail with Tyler McIntosh and Jacob Wetch.  He described Tyler McIntosh seeing Jovan Harris and yelling that Jovan Harris was a police "snitch."  He described Mr. McIntosh jumping onto and attacking Jovan Harris, with Mr. Harris being the victim.  Mr. Pettersson admitted that after the incident that he, Jacob Wetch and Tyler McIntosh had spoken about Jovan Harris, indicating they did not like him.

### 7.    Dr. Kelly Mills

Dr. Kelly Mills ("Dr. Mills"), medical examiner with the Ramsey County medical examiner's office testified next at the jury trial.  Dr. Mills described the chain of custody that

the body of Jordan Larry had gone through and the testing that was done to determine the cause of death.  She confirmed Mr. Larry's death was due to a heroin overdose and that no other drugs were found in his body that could have caused his death.  Dr. Mills admitted that she was unable to tell through her testing how long Mr. Larry would have maintained the drugs prior to his ingesting them.  Dr. Mills also admitted that the testing performed could not evaluate whether the heroin he had taken matched the heroin found at Mr. Larry's death scene.  Dr. Mills also stated she could not compare the heroin in Mr. Larry's system with any other heroin, in an effort to determine the drug's source.

       8.    *Jacob Wetch*

Jacob Wetch ("Mr. Wetch") testified next in the trial.  Mr. Wetch admittedly was a heroin addict and convicted felon with convictions for drug paraphernalia and conspiracy to deliver heroin.  Mr. Wetch readily admits he was a seller of heroin, having sold to many others, including other government witnesses, Tyler McIntosh, Derek Pettersson and Morgan Masters.  Mr. Wetch also admitted to selling to the decedent, Jordan Larry, within days of his death, although his testimony changed.   Initially, during a task force interview and investigation, Mr. Wetch said he sold heroin to Jordan Larry the day before his death.  During his testimony he denied this, although was forced to admit that he had sold heroin to Jordan Larry previously.  He also admitted to providing a statement to the task force after being told that they were targeting Jovan Harris.  He also admitted that this was to keep him from being federally indicted and serving lengthy prison time.  Mr. Wetch was, at the time of his testimony, participating in the methodone drug program in Fargo.

Mr. Wetch's testimony contained numerous instances of contradictions and

2361609.1

inconsistencies with other witnesses.   At one point, when being confronted with these obvious credibility issues, Mr. Wetch attempted to exercise his 6th Amendment right to an attorney, demonstrating his concern over his legal rights.   The Court responded to his demand by indicating he, Mr. Wetch, could not have one.

Mr. Wetch readily admitted he had been selling heroin for a lengthy period of time. He testified that he met Jovan Harris in the summer of 2015, and that he had been selling heroin for a number of years prior to this meeting.   Mr. Wetch testified that he had been obtaining his heroin from multiple sources, including Corey Heinze, James Smith and others. Mr. Wetch claimed to be a serious heroin addict, and used, on average, $300 per day for over a year and a half to support his habit.   He claimed to have no job and supported his habit selling heroin and other drugs to approximately 50 different people.   When confronted with the math showing he would have been using $149,100.00 worth of drugs during that period, and could not have been supported by selling to just 50 people, Mr. Wetch had no explanation.   Mr. Wetch testified that he met Jovan Harris through Brazil Midell.   He stated Jovan Harris, known to him as "Pooh", had given him some free heroin to try.   After this initial meeting, Mr. Wetch indicated "Pooh" gave him his phone number to contact him for drug deals.   Mr. Wetch was asked what telephone number was provided, but Mr. Wetch indicated that he no longer had it, and didn't remember it.

Mr. Wetch testified that during the summer of 2015, he would meet with "Pooh," often 2-10 times per day, each time to obtain heroin.   He testified that "Pooh" would drive different vehicles, a Chrysler, a Buick, a Yukon, and while the vehicles would often change, they always had Illinois license plates.   This contradicts the testimony of numerous other

2361609.1

witnesses called by the government, including Alexis Centers, Derek Pettersson and Tyler McIntosh and their description of Jovan Harris' vehicle.

Mr. Wetch also admitted to being in jail with Tyler McIntosh and Derek Peterson. He admitted that at that time, they had accused Jovan Harris of being a snitch and fought with him. He admitted they had discussed Jovan Harris while in jail. Mr. Wetch testified that he frequently gathered with other government witnesses, Tyler McIntosh, Morgan Masters, and others to sell, exchange, or share drugs. He testified that he was at the McIntosh residence March 22, 2016, when the task force raided the residence and said that he had gotten high with Tyler McIntosh when they split some heroin that day. Although claiming he was a frequent visitor to the home, he denied knowing who Paul Ramirez was, a person who had been living there for over a month and a person who was present in the residence just prior to the raid.

Mr. Wetch also said that he knew Derek Pettersson. Mr. Pettersson had previously testified that he was good friends with Mr. Wetch, and had used Mr. Wetch to obtain heroin on at least 45 occasions. Mr. Wetch said that he did not consider Mr. Pettersson a friend, and had only attempted one heroin transaction with him. This was the incident when Mr. Pettersson had stolen drugs from him. Mr. Wetch said he never did business with him again. When asked why Mr. Pettersson would claim over 45 different transactions with him, Mr. Wetch had no answer.

Finally, Mr. Wetch claimed to have spoken with Mr. Harris around the time of Mr. Jordan Larry's overdose. In a previous statement to the task force, Mr. Wetch said nothing relating to Jordan Larry's death, but in his preparation for trial testimony, Mr. Wetch

claimed to have gone to the Mall of America and met with Jovan Harris to buy heroin from him.  Mr. Wetch also claimed Jovan Harris had called him by phone, but had no information relating to the number that had called him.  Mr. Wetch also said that Jovan Harris did not come back to the Fargo/Moorhead area for a long time after Mr. Larry's death.  He claimed to have called Mr. Harris to get heroin and was directed to seek out James Smith to buy his heroin.

9.     *Paul Ramirez*

Paul Ramirez ("Mr. Ramirez") testified for the Government next.  Mr. Ramirez was the undercover criminal informant/agent utilized by the task force in allegedly making two undercover buys from Jovan Harris, one on March 21st and the other on March 22nd, 2016.

Mr. Ramirez, as with all of the government's witnesses, was an admitted drug addict. He was the person who had introduced heroin use to Morgan Masters, and introduced "injecting" heroin to Tyler McIntosh.  At the time of his use by the drug task force, Mr. Ramirez had a pending felony Terrorizing charge in Fargo which had the potential of sending him to prison.  He was caught in Moorhead, MN attempting to sell methamphetamine to an undercover officer who'd been alerted to him through a friend's cell phone.  Mr. Ramirez testified that, if charged and convicted of the drug sale, he believed he would be going to prison on his terrorizing charge or the drug sale crime, or both.  The task force offered Mr. Ramirez to erase his crime without any consequences (by not forwarding the crime for charging) if he agreed to perform two (2) undercover buys of drugs.  Mr. Ramirez readily agreed and met with Agent Daniel Heidbreder for the purpose of setting up the buys.

Mr. Ramirez informed Agent Heidbreder that he would do his buys at 915 College

Street in the basement apartment, the apartment rented by his friends, Tyler McIntosh and Morgan Masters.  He neglected to inform Agent Heidbreder that he had been living there with McIntosh and Masters for over a month, and had just been asked to temporarily vacate the apartment so Jovan Harris could stay in his room.  Mr. Ramirez admitted that he not only withheld this information from Agent Heidbreder, but he also withheld his relationship with McIntosh and Masters, and that they were people with whom he frequently sold drugs and shared drugs.  He also neglected to inform Agent Heidbreder that he had been to this apartment the day before so he could shoot up heroin with McIntosh.

Mr. Ramirez informed Agent Heidbreder that he believed Jovan Harris would be present and that Harris only sold heroin in points, .1 grams increments.  When Agent Heidbreder asked Mr. Ramirez if he could get a one-half gram amount, Mr. Ramirez said he did not know the cost, and that it could be as high as $250.00.  Agent Heidbreder told Mr. Ramirez that during the transaction he should "talk" about the deal, about the drugs, about the price and cash.  This would allow a body microphone that was fixed to Mr. Ramirez's body to pick up the transaction.  Mr. Ramirez was then searched to make sure he had nothing on his person that would compromise the "buy," given $250 in buy funds and sent into the apartment with a surveillance team watching his every move.  Mr. Ramirez knocks on the door to the apartment and has a conversation with Ms. Masters and Mr. McIntosh.  He immediately asks about where his dirty clothes are, and is directed into the bathroom.  He is overheard on the audiotape complaining of making several attempts to call McIntosh, but has been unable to reach him.  Ms. Masters informs him that he has been using the wrong number.  The audiotape displays sounds of Mr. Ramirez going into the bathroom and using

the facilities.  Mr. Ramirez is then heard speaking with people for about 10 minutes.  There is no conversation relating to the desire to buy heroin, no conversation about wanting a ½ gram of heroin, and no conversation about the price of heroin or the transfer of buy funds.  It is at this juncture that Mr. McIntosh has a epileptic seizure.  Despite having told task force members the seizure was due to his previous diagnosis for epilepsy and his failure to properly take his medications, Mr. McIntosh now states it may have been from the drugs given to him by Jovan Harris.  This testimony is in direct contradiction of statements given by Ms. Masters and Mr. Ramirez.  Mr. Ramirez leaves the apartment and meets with Agent Heidbreder.  During a debriefing, Mr. Ramirez tells the agent that he entered the apartment, approached Jovan Harris, gave him $250 of the buy funds and retrieved heroin left for him in the bathroom.  Mr. Ramirez, on cross-examination, stated he did not know what happened to the buy funds or who took them.  He did state that he got the heroin which was left loose for him in the bathroom, using a baggie he kept in his wallet, in anticipation of coming in contact with drugs.  It should be noted that Agent Heidbreder stated Mr. Ramirez had no such baggie on his person when he was searched prior to the buy.  This means that either Agent Heidbreder missed it during his search, which is unlikely, or that Mr. Ramirez was hiding it inside the residence.  Despite there being no conversation on the audio tape, despite Mr. Ramirez not following the drug talk protocol, arrangements were made to make another buy the next day.

The next day Mr. Ramirez met with Agent Heidbreder and went through the same procedure as the previous day, his search, body transmitter and surveillance.  He knocked on the apartment door and was allowed entry.  He again had menial conversation with the

occupants and 15 minutes later exited the apartment to again meet with Agent Heitbreder. He again described entering the apartment and making a buy from Jovan Harris. As before, the body transmitter revealed an audio version of the events which has no discussion of drugs, amounts or buy funds. Jovan Harris' voice can be heard on the tape, but only discussing a video game and how it is played. Mr. Ramirez now testifies that he received the drugs in a blue baggie in the bathroom.

Mr. Ramirez leaves the apartment and again debriefs with Agent Heidbreder describing a face to face drug transaction with Jovan Harris. Despite the lack of evidence to show either buy had taken place, much less with Jovan Harris, Agent Heidbreder confirms Mr. Ramirez' cooperation and signs his agreement which keeps Mr. Ramirez' drug sale from ever being charged.

### 10.    Morgan Masters

Morgan Masters ("Ms. Masters") testified next in the trial. She testified that she was Tyler McIntosh's girlfriend (and mother of his child), and lived with him in the basement apartment on College Street. She admitted that she also had felony convictions for drug possession and was a heroin addict. She described having Mr. Ramirez introduce her to the use of heroin. Ms. Masters admitted to giving a prior statement to the task force personnel and did so at the same time as her boyfriend, Tyler McIntosh. Ms. Masters initially said that she only got her heroin through Mr. McIntosh, but then changed her statement to say that she had taken turns getting her heroin with Mr. McIntosh. She also initially stated she was aware of Jordan Larry's overdose, but did not know the source. She then changed her statement in preparation for trial, saying she believed the source was "Pooh" which matched the statement

of her boyfriend, Tyler McIntosh.  Ms. Masters testified that she experienced an overdose on heroin in late August.  In her initial statement to task force members, she had stated she was unsure where the heroin had come from, and relied upon Mr. McIntosh to tell her it was from "Pooh."  She later changed her statement, saying she had purchased the heroin directly from "Pooh."  Her testimony relating to the controlled buys involving Paul Ramirez also contained alternative facts from previous witnesses.  She admitted that she was present during the March 21st buy, and described Mr. Ramirez coming into their apartment and speaking with herself and Mr. McIntosh.  She testified under oath that Mr. Ramirez never left the kitchen area of the apartment, and that the heroin was left on the stove in the kitchen.  She also recounted that while in the kitchen Ramirez had filled a spoon with some of the drug and water.  She observed him heat the spoon and then take the heroin and inject it into himself. She described Mr. Ramirez living with them in the apartment, and that he did not share his drugs very readily, despite the fact that Mr. Ramirez would leave the area to travel to an unknown location near Alexandria, and return with large amounts of heroin.  Ms. Masters statements are inconsistent, if not completely contradictory with testimony given by other government witnesses.

    Ms. Masters testified that in late August, 2015, she experienced an overdose and that the drugs came from Jovan Harris.  This testimony followed her initial statement to the task force, where she indicated she did not know where the drugs came from, and had to rely upon Tyler McIntosh to tell her.  Ms. Masters was unable to provide any evidence, other than the testimony of herself, and her boyfriend, Tyler McIntosh, that the drugs causing this overdose came from Jovan Harris.  No witnesses, no phone records, no pictures, no

videotape.  In fact, Ms. Masters failed to provide any testimony indicating where the drug transaction took place, or any of the terms of the transaction.  She only corroborated the testimony of Tyler McIntosh who readily admitted that he hates Jovan Harris, has had fights with him, and whom he wants to be prosecuted.  Ms. Masters also made an admission which brings into question her entire testimony.  Ms. Masters, when cross-examined, admitted that she, and others, would lie to protect her friends and her drug sources, and she identified most, if not all the government's non-law enforcement witnesses as friends, and sources from whom she had received drugs.

     *11.    Tyler McIntosh*

Tyler McIntosh ("Mr. McIntosh") testified next at the trial.  Mr. McIntosh, as is the case with all the government non-task force witnesses, is a drug addict.  He has at least two (2) prior felony drug offenses, including one for delivery of heroin.  Mr. McIntosh admitted that he hates Jovan Harris, and wanted him prosecuted by the task force.  His cooperation with the task force was paramount in his efforts to not only cause harm to Jovan Harris, but also to avoid criminal prosecution and inclusion in the indictments of himself, his girlfriend, Morgan Masters, and his close friend, Paul Ramirez.  Mr. McIntosh admitted that he was good friends with Paul Ramirez and admitted to living with him, and also described using and sharing heroin with Mr. Ramirez, including having him introduce him to injection of heroin.  He also admits to communicating with Mr. Ramirez regularly by phone and text. During his first interview with the task force, he was told by the officer that they (the task force) informed Mr. McIntosh that they did not intend to get him (Mr. McIntosh) or any of his friends in trouble.  The task force wished to target their investigation on black males

bringing heroin into the region.  The task force representative specifically mentioned their desire to gain information relating to Jovan Harris.  During Mr. McIntosh's initial statement to task force members, he stated that he received his heroin from someone known to him as "P" who was believed to be James Smith, but changed his statement when preparing for trial stating that his source was "Pooh", Jovan Harris.  Mr. McIntosh initially denied making the prior statement identifying the source as "P", James Smith, but after having a portion of his previous interview played to refresh his recollection, Mr. McIntosh was forced to admit that he previously admitted to buying from "P," James Smith and not from Jovan Harris.  Mr. McIntosh also admitted to telling task force members that his seizure on March 21st was due to his epilepsy and failure to take medication, and then when preparing for trial, he changed his statement to say that he "might" have gotten up and used heroin in the morning, and that may have caused his seizure.  When asked why he initially said his seizure was not due to drug ingestion, Mr. McIntosh said he didn't remember.  Mr. McIntosh also gave a statement to an investigator for Mr. Harris in which he stated that he didn't even know who Jordan Larry was.  Then in testimony, Mr. McIntosh said that he did know who Jordan Larry was, and that he observed Jordan Larry together with Jovan Harris as they were arguing over quality of drugs and price.  This is not only inconsistent with his prior statement, but conflicts with the statement given by James Smith, that he had never met with Jovan Harris, much less had him at his home.  Again, when asked why he lied, Mr. McIntosh initially testified claimed to be trying to "protect" Jovan Harris, a person he admits to hating, and "wanted" to have him prosecuted.  When pressed on this, Mr. McIntosh testified, "I don't remember."

2361609.1

Mr. McIntosh testified that he experienced an overdose on or about September 1st, 2015, around the same time as the Jordan Larry overdose, and that the drugs came from Jovan Harris.  Mr. McIntosh was unable to provide any evidence, other than the testimony of himself, and his girlfriend, Morgan Masters, that the drugs causing the overdose came from Jovan Harris.   No witnesses, no phone records, no pictures, no videotape.   In fact, Mr. McIntosh failed to provide any testimony indicating where the drug transaction took place or any of the terms of the transaction.  He only provided testimony against Jovan Harris, whom he hates, has had fights with, and whom he wants to be prosecuted.

### 12.   *Agent Daniel Heidbreder, DEA Task Force Officer*

The last witness for the Government was Agent Daniel Heidbreder, DEA Task Force Officer ("Agent Heidbreder") who was the primary investigating agent assigned to the case. Agent Heidbreder admitted that he got involved with Paul Ramirez after drug task force members caught him in a drug sting in Moorhead, MN.  Agent Heidbreder admitted that in working with Ramirez, he was unaware of Mr. Ramirez relationship with the target apartment on College Street, and was also unaware of his relationship with the occupants of the apartment.  Agent Heidbreder admitted that he could only search Mr. Ramirez and had no control or visual supervision of Mr. Ramirez once he entered the apartment, and that Mr. Ramirez would have every opportunity to hide drugs in his old room or apartment, and obtain them when he was sent in to conduct the buys.  Agent Heidbreder admitted that he had no way of searching the residence prior to the two buys to make sure the drugs were actually coming from Jovan Harris, as opposed to Mr. Ramirez retrieving hidden drugs from a secret location he had in his own residence.  Agent Heidbreder also testified that he could not hear

any conversation relating to any illegal activity from the audiotape taken by the body transmitter placed on Mr. Ramirez, despite his repeated counseling of Mr. Ramirez to include them.  The only lengthy conversation that could be heard was between Mr. Ramirez and Tyler McIntosh (not Jovan Harris).  Agent Heidbreder testified that he did not hear any "slang" terms used by any party that would indicate that drugs were being transacted.

Agent Heidbreder testified that a search warrant was obtained for a search of the apartment a short time after the second buy.  He testified that Jovan Harris was found in the apartment with Tyler McIntosh and Jacob Wetch.  He testified that the buy funds, all from the 2nd buy, and most from the 1st buy, were found in a laundry basket in the living room of the apartment and that an identification card of Jovan Harris was found with the funds.  He stated that Jovan Harris was not found in a room where there were any drugs or contraband. Agent Heidbreder also testified that there were no "packaging" containing any drugs.  The only packaging that is mentioned is the baggie that Paul Ramirez states he kept on his person in case of obtaining drugs in a loose condition.  Ramirez' baggie was not found by Agent Heidbreder during his search (something that Agent Heidbreder testified could not have occurred).  Mr. Harris is alleged to have brought heroin to the McIntosh apartment, but the only "container" that has residue of heroin belongs to Paul Ramirez, a container that Agent Heidbreder indicates could not have been on Paul Ramirez person when he entered the apartment.  The only item found to have heroin residue was a scale that was found in Tyler McIntosh's bedroom.  No drugs, or residue were found on anything connected to Jovan Harris.

## LAW AND ARGUMENT

Mr. Harris has made a Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and a Motion for New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Because of the different relevant standards, each requested relief is discussed separately.

## I.     MR. HARRIS IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON THE GROUND THAT THERE WAS INSUFFICIENT EVIDENCE INTRODUCED AT TRIAL TO SUPPORT HIS CONVICTION ON THE CHARGED OFFENSES.

Federal Rule of Criminal Procedure 29 governs Mr. Harris's Motion for Judgment of Acquittal. Rule 29(a) provides: "After the government closes its evidence or after the close of all of the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  If the jury returns a guilty verdict, the defendant may renew a motion for judgment of acquittal "within 14 days after a guilty verdict or after the court discharges the jury, whoever is later." Fed. R. Crim. P. 29(c)(1).  Here, Mr. Harris has renewed his motion for judgment of acquittal.

Again, a judgment of acquittal is only appropriate if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Admittedly, "the standard for determining the sufficiency of the evidence is strict, and a guilty verdict should not be lightly overruled." United States v. Jiminez-Perez, 238 F.3d 970, 972-73 (8th Cir. 2001) (citing United States v. Ryan, 227 F.3d 1058, 1063 (8th Cir. 2000)). "Sufficient evidence exists to support a verdict if 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

2361609.1

Jiminez-Perez, 238 F.3d at 972 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

To convict Mr. Harris of the charged conspiracy offenses – the Government was required to prove beyond a reasonable doubt that: (1) two or more persons reached an agreement or came to an understanding to distribute heroin; (2) Mr. Harris voluntarily and intentionally joined in the agreement or understanding; and (3) Defendant knew the purpose of the agreement or understanding at the time he joined in the agreement or understanding. See e.g. Final Jury Instructions.  Even viewing the evidence presented in the light most favorable to the prosecution, a rational trier of fact could not have found that Mr. Harris voluntarily and intentionally joined in the agreement or understanding to distribute heroin with anyone.

The evidence presented at trial was circumstantial, at best.  Essentially, the Government paraded a number of previously convicted drug felons into Court to testify that at some point or another, they obtained heroin from Mr. Harris.  The evidence of all these individuals was conflicting in major ways.  The people involved, vehicles utilized, even the locations did not match up, and all of the individuals who testified against Mr. Harris at trial were given immunity or preferential treatment by the taskforce so that they either did not face any charges as a result of their involvement in the alleged conspiracy, or received preferential treatment on other existing criminal investigations.  As outlined above, many of these individuals testified to being involved in the distribution of a large amount of drugs, including heroin, but ultimately faced either lesser sentences, or no charges whatsoever, so long as they testified against Mr. Harris at the trial.

The Government's case consisted of only the aforementioned witnesses whose

credibility was lacking.  The Government did not produce any solid evidence showing Mr. Harris ever possessed heroin, much less was allegedly involved in the distribution of heroin. The Government did not corroborate the witnesses' testimony establishing any conspiracy. While the Government did produce undercover buys involving Mr. Harris, these buys are based solely upon circumstantial evidence from witnesses who are shown to be biased, and motivated by setting up Mr. Harris, and fabricating the circumstances surrounding the buy. Further, the Government did not present any cell phone records from Mr. Harris's phone or others establishing drug transactions, despite admitting it had been seized from Mr. Harris the day he was arrested, despite their claims that "innocent" language could potentially be interpreted as involving drugs.  Instead, the Government relied solely upon other individuals - co-conspirators - to point the finger at Mr. Harris in order to allow themselves to be free from criminal prosecution.

The Government will likely point to Paul Ramirez and his arrest and his subsequent buys as direct evidence of Mr. Harris's involvement.  However, this testimony and its lack of credibility fails to demonstrate that Mr. Harris reached an agreement to distribute heroin.

In this case, the Government's lack of solid evidence gives equal support to the theory of innocence of Mr. Harris.  The evidence fails to establish beyond a reasonable doubt that Mr. Harris joined in an agreement to distribute heroin.  The credibility of the witnesses is lacking.  The "witnesses" were all admitted drug users, involved in the alleged conspiracy, most with prior felony convictions, and able to walk away from the case without so much as a minor criminal charge so long as they testified against Mr. Harris.  The absence of corroboration is further emphasized by the government witnesses and their total lack of

2361609.1

credibility.  The Government's evidence fails to corroborate even the notion that Mr. Harris was involved in any possession or distribution of heroin.  Accordingly, Mr. Harris is entitled to judgment of acquittal.

## II.   MR. HARRIS IS ENTITLED TO A NEW TRIAL, AS THE WEIGHT OF THE EVIDENCE IS CONTRARY TO THE VERDICT.

Assuming, arguendo, the Court concludes a Judgment of Acquittal is unwarranted pursuant to Rule 29, Mr. Harris remains entitled to a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Rule 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  The District Court has broad discretion in considering a motion for a new trial. See United States v. Garcia, 569 F.3d 885, 889 (8th Cir. 2009); United States v. Peters, 462 F.3d 953, 957 (8th Cir. 2006). Indeed, the District Court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002) (quoting White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992)) (internal quotation marks omitted).  That said, the District Court is to exercise the Rule 33 authority "sparingly and with caution." Campos, 306 F.3d at 579 (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). The Eighth Circuit Court of Appeals has explained:

> [W]hen a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict, it may weigh the evidence and in doing so evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

2361609.1

United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980); see also United States v. Johnson, 474 F.3d 1044, 1050-51 (8th Cir. 2007) (repeating applicable standard of review). As with the arguments made above, the evidence put forth by the Government, when objectively viewed, creates a distinct possibility that a "miscarriage of justice may have occurred" in this case.  Quite simply, the verdict in this case is contrary to the weight of the evidence.  A reexamination of the evidence presented by the Government poses significant doubt as to the validity of the conviction for a multitude of reasons.

First, the Government attributes the lack of physical evidence to this being a "historical conspiracy," but that is simply not true nor an excuse.

Agent Martin testified that he did not obtain cell phone records to establish the content of messages between Jordan Larry, the decedent, and Jovan Harris.  Agent Martin and Agent Heidbreder testified that they did not search phone records for contacts between Tyler McIntosh, Morgan Masters, Paul Ramirez and Jovan Harris.  This investigation in theory, would have corroborated the witnesses' testimony regarding Mr. Harris and the true contacts between himself and the co-conspirators.  In short, the Government in this case took no meaningful action to actually corroborate the alleged drug conspiracy and relied solely upon the uncorroborated biased testimony of co-defendants.

This lack of corroboration leads directly to the second shortcoming of the government's case: the inherent bias and unreliability of the Government's witnesses.  Again, all of the Government's witnesses had incredible motivation to tell the Government what it wanted to hear.  They all admitted involvement in the alleged conspiracy – some to a greater extent than others, and most importantly, all of them were told that they would not

face <u>any</u> criminal charges so long as they testified against Mr. Harris at trial.  Moreover, most of the witnesses testified to being drug addicts in the past, or even currently, and to having prior criminal convictions, including prior drug felony convictions.  The credibility of all of the witnesses against Mr. Harris is inherently flawed.

Even if these shortcomings are to be overlooked, the Government's witnesses were still unable to provide a coherent tale.  The inconsistencies of the testimony at trial were countless.  For example, Ms. Masters testifying that she was present for a drug deal between Mr. Harris and Mr. Ramirez, and that the transaction took place in the kitchen of the apartment with Mr. Ramirez shooting up with heroin during the buy and the remaining heroin being left on the stove.  Derek Pettersson testifying to conducting 45 drug sales with Jovan Harris through Jacob Wetch, only to have Jacob Wetch indicating there were no sales, only one incident where Mr. Pettersson stole from him.  Another inconsistency occurred when James Smith said he never met Jovan Harris, or ever saw him with any drugs, where other witnesses claim to have seen them hanging out on a regular basis.  These inconsistencies only scratch the surface of those made during the testimony of the alleged co-conspirators.

Because the Government's witnesses could not spin a cohesive yarn, their testimony is of little substantive value against Mr. Harris, producing serious doubt as to the conviction of Mr. Harris.  Because there is a real possibility that a "miscarriage of justice may have occurred" in Mr. Harris's conviction, Mr. Harris is entitled to a new trial.

## **CONCLUSION**

For the foregoing reasons, the Court should provide Mr. Harris with a Judgment of

Acquittal.  However, if the Court concludes a Judgment of Acquittal is unwarranted, based on the evidence actually used to convict, Mr. Harris is entitled to a New Trial.

Dated this 14th day of June, 2018.

**VOGEL LAW FIRM**

/s/ *KENNETH J. KOHLER*

BY:  Kenneth J. Kohler(#0143170)
215 30th Street North
P. O. Box 1077
Moorhead, MN  56561-1077
Telephone:  218.236.6462
Email:      kkohler@vogellaw.com
ATTORNEYS FOR DEFENDANT

2361609.1