IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-cr-00272 |
| Plaintiff, | **UNITED STATES' RESPONSE TO RULE 29 AND RULE 33 MOTIONS** |
| v. | |
| JOVAN MARQUIS HARRIS, | |
| Defendant. | |

The United States of America, by Christopher C. Myers, United States Attorney for the District of North Dakota, and Brett M. Shasky, Assistant United States Attorney, hereby files this response in opposition to Defendant's motions for acquittal under Rule 29, and for a new trial under Rule 33, and supporting memorandum. (DCD 98, 99, and 105).

### Rule 29 Motion for Acquittal

The defendant contends that there was insufficient evidence to prove beyond a reasonable doubt that he at any point joined in any conspiracy to distribute heroin to anyone. (DCD 105 at 27-30). He asserts that there was nothing more than circumstantial evidence and that came from unreliable and biased witnesses. To the contrary, the evidence presented at trial provided sufficient corroborative evidence to sustain the jury verdict and, consequently, the jury verdict should stand.

In considering a motion for judgment of acquittal, a district court has very limited latitude. United States v. Robins, 21 F.3d 297, 298-99 (8th Cir. 1994) (citing United States v. Pardue, 983 F.2d 843-847) (8th Cir. 1993) (quoting United States v. Jewell, 893

F.2d 193, 194 (8th Cir. 1990)). The Court cannot weigh the evidence or assess the credibility of witnesses. Id. Rather, it must determine whether "the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged." Id. (quoting United States v. Mundt, 846 F.2d 1157, 1158 (8th Cir. 1988)).

A motion for judgment of acquittal under Rule 29 is directed solely at sufficiency of the evidence. The government must be given the benefit of all inferences that may logically be drawn from the evidence. United States v. Brown, 921 F.2d 785, 791 (8th Cir. 1990) (citing United States v. Marin-Cifuentes, 866 F.2d 988, 992 (8th Cir. 1989). It is not necessary that the evidence exclude every reasonable hypothesis except guilt; instead, the evidence is sufficient if it will convince a trier of fact beyond a reasonable doubt that the defendant is guilty. Id. The district court may not substitute its own subjective interpretation of the evidence for that of the jury. A court should grant a motion for acquittal if, after viewing all the evidence in the light most favorable to the verdict with every logical inference drawn in the government's favor, the court finds there is insufficient evidence to support the verdict. United States v. Aguilar-Portillo, 334 F.3d 744, 747 (8th Cir. 2003) (citations omitted).

Additionally, the Eighth Circuit Court of Appeals has explained:

[T]he [district] court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). [The Court reviews] the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict. United States v. Herbst, 666 F.3d 504, 510 (8th Cir. 2012). "Reversal is warranted only if no reasonable

> jury could have found guilt beyond a reasonable doubt." Id. We further note that "in reviewing a defendant's challenge to the sufficiency of the evidence, '[w]itness testimony . . . does not need to be corroborated.'" United States v. Perez, 663 F.3d 387, 391 (8th Cir. 2011) (alterations in original) (quoting United States v. Jefferson, 652 F.3d 927, 930 (8th Cir. 2011)).

United States v. Mayer, 674 F.3d 942, 944 (8th Cir. 2012).

In this case, the evidence was sufficient for the jury to find the defendant guilty of the charged crimes for which they returned guilty verdicts. The defendant relies primarily on the asserted lack of credibility of the government witnesses. However, the district court may not substitute its own subjective interpretation of the evidence for that of the jury, which is responsible for determining credibility of the witnesses in a Rule 29 motion. Here, obviously the jury found sufficient credible evidence from the testimony and other evidence introduced at trial to reach a verdict of guilty as to Counts One, Two, Three, Five, Six, and Seven. They were unable to find sufficient evidence to reach a guilty verdict as to Count Four. In viewing the evidence in a light most favorable to the government, the Court must conclude that the defendant is guilty of those offenses for which the jury returned a guilty verdict. The evidence was presented to the Court in trial, and the motion for acquittal was addressed at the conclusion of the prosecution's case. The arguments and evidence are the same now as they were then, so will not be re-iterated here. In the response to the motion for new trial below, the United States sets forth specific facts which would apply equally to the Rule 29 motion, and refers the Court to those facts as needed.

**<u>Rule 33 Motion for New Trial</u>**

The Court may order a new trial "if the interests of justice so require." Fed. R. Crim. P. 33. When ruling on a motion for a new trial, the Court has broader discretion than on a motion for judgment of acquittal under Rule 29. <u>United States v. Campos</u>, 306 F.3d 577, 579 (8th Cir. 2002). It may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." <u>White v. Pence</u>, 961 F.2d 776, 778 (8th Cir. 1992). The Court's discretion is not unlimited, however, and it must exercise its authority "sparingly and with caution." <u>Campos</u>, 306 F.3d at 579. Unless the Court determines that a miscarriage of justice will occur, the jury's verdict must stand. <u>Id.</u>

Defendant claims that the verdict in this case was contrary to the weight of the evidence, creating a miscarriage of justice. (DCD 105 at 30-32). In support of this position, the defendant argues the United States relied on uncorroborated biased testimony, and that law enforcement failed to obtain various records or conduct certain other investigative acts to corroborate the testimonial evidence. Harris' arguments are not consistent with the record of the trial. The testimony of the so-called "biased" witnesses, was, in fact, corroborated by other evidence, including records, videos, and the testimony of other witnesses.

1. **<u>Count One</u>**

Harris was charged in Count One of the Indictment with Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance Resulting in Serious Bodily Injury and Death. The charge involved a conspiracy to distribute heroin which

4

also included four separate overdose incidents, one of which was fatal. One non-fatal overdose involving Tyler McIntosh resulted in an acquittal, and will not be addressed here.

Evidence regarding the conspiracy involved testimony from Alexis Centers, Derek Pettersson, Jacob Wetch, Morgan Masters, Tyler McIntosh, Paul Ramirez, James Smith, and Task Force Officer Dan Heidbreder. All spoke of their knowledge of Harris dealing heroin, that they were customers of his, that he arranged the receipt of heroin from others, and about controlled buys and a search warrant involving Harris. Because we have not yet been able to obtain transcripts of the trial proceedings, the recitation to testimony is from the recollection of the undersigned, and does not cite to the record.

Virtually all of these witnesses corroborated each other on certain incidents or facts. For instance, Centers, Pettersson, Masters, McIntosh, and Wetch all mentioned Harris, at some point during his dealing, drove a silver Chrysler, most noting it was a Chrysler 300. Deputy Canales testified that Harris was stopped while driving a silver Chrysler 300 on July 27, 2015, a few weeks before Jordan Larry's death. Detective Martin testified about having information that Harris drove a car matching that description and that it had a Wisconsin license plate. He further provided a video from the Stamart Liquor Mart in Fargo from the time Jordan Larry was known to have picked up heroin from his source. A Chrysler 300, silver-ish in color was seen entering and leaving the parking lot several times. The last time the vehicle entered, it parked east of the building just out of camera view. Moments later the car bearing Larry and Zach Speiker entered the lot and parked in the same area, just out of camera view. We know

that Speiker confirmed Larry was in the car with Speiker. After approximately a minute and a half, both cars left without anyone entering the store. The United States also introduced a still shot from the video. Though blurred, the license plate on the vehicle appears to be a Wisconsin plate and matching the number of the vehicle Harris was driving in July. This same car matched the description of the vehicle Centers testified she observed Larry's source sitting in on several occasions when she drove Larry to pick up heroin from the source.

Jacob Wetch, Derek Pettersson, Morgan Masters, Tyler McIntosh, and James Smith testified about the Northport Hornbacher's area where many deals took place. Centers, Wetch, Masters, and McIntosh all testified that they met Harris in that area, or met his designee, James Smith there to pick up heroin. Smith testified that he would get a call from Harris' phone and then girls would show up with the heroin. Most of it was given to Wetch for resale. The money was then given to the girls, presumably to give to Harris. McIntosh, Masters, and Wetch all testified that they were told by Harris to contact Smith to get their heroin when Harris was unavailable. Smith also testified that he sold approximately 10 grams of heroin for Harris. Wetch testified that on his first meeting with Harris he was given a free sample of heroin, which was a kind of business practice.

Derek Pettersson and JacobWetch, while not entirely consistent with their recollections, testified about an incident in which they were corroborating each other on very specific details that took place. They each testified as to an incident in which Wetch and Harris met Pettersson to give him some heroin, and Pettersson ripped them off. It resulted in a car chase near the south Fargo Walmart, and both testified about Wetch and

Harris chasing Pettersson and throwing wrenches and other objects at Pettersson's car during the chase. Limited in relevance, but corroborative of each other's testimony as to the dealing and Harris being involved.

Other evidence of the conspiracy includes the controlled buys between Harris and Paul Ramirez. Harris, of course, asserts alternative theories for these matters. On the one hand, he asserted at trial that Ramirez had secreted the heroin at the apartment before doing the deals. On the other hand, he argued that the heroin was McIntosh's and Ramirez was pointing the finger at Harris to protect McIntosh. Nobody disputes that the persons present in the apartment during the first controlled buy were McIntosh, Masters, Ramirez, Harris, and a friend of Harris'. McIntosh, Masters, and Ramirez all testified that the heroin Ramirez bought in the apartment on two occasions was from Harris. The only relevant inconsistency among them was that Masters thought the heroin was sitting on the stove when Ramirez picked it up, and McIntosh and Ramirez said it was in the bathroom. However, when listening to the audio of the buys, it was clear that there were portions of the recordings of the transactions which supported Ramirez's testimony that Harris was the source. For instance, during the March 21, 2016 buy, Ramirez is talking to McIntosh, asking him "I was trying to see if dude could hook it up or something?" Clearly he was talking about someone other than McIntosh. Later in the conversation, McIntosh is telling Ramirez "*He's* going to weigh it up right now, just wait." (emphasis added). Finally, toward the end of the conversation Ramirez asks McIntosh "ask *him* if I get a deal, if I get a G or something, next time. I don't know." (emphasis added). Again, if Ramirez is getting it from McIntosh, there would be no other "he" weighing it up, and no need to ask

"him" if he could get more next time.  If McIntosh was the source for Ramirez it would have been "I am weighing it up" or "can you give me a deal for a G next time." Clearly, there was a different male source present besides McIntosh and Ramirez, and nobody indicated it was Harris' friend.

Similar facts were presented as to a second controlled buy from the same location the following day, March 22, 2016. The testimony was from Ramirez, McIntosh, and TFO Heidbreder, which indicated the same parties were present with the exception of Masters. This time Ramirez testified to getting the heroin from Harris just like the first buy, and that certain discussions occurred within the apartment during the transaction. Ramirez testified about getting the same half gram amount and the lack of a scale to weigh the heroin on this occasion, so they "eye-balled it." He also testified that during this buy he was asked about what happened to the heroin from the previous day, and replied that he only got a point from it. Both of these conversations can be heard upon careful listening to the audio.

Finally, as corroborative evidence of Harris being involved in the conspiracy, there is the search warrant on March 22, 2016. Harris was present at the time. None of the parties involved had knowledge of the plan to do the search warrant after the second buy. Nobody could have planned to set up Harris as nobody knew he would be there at the time. Similarly, there is no way Ramirez, McIntosh, and Masters could have planned the buys to set up Harris in the first place. Harris repeatedly misunderstood the evidence and timeline involving Ramirez. Harris contended that there were several days between the Ramirez arrest in Moorhead and the buys from Harris. He asserted there was time for the

8

three friends to gather together and plan this whole thing out to frame Harris. Yet, the evidence showed that there was a matter of a few hours between the arrest of Ramirez and his first buy from Harris. The arrest and the buy happened on March 21. In between was a debrief of Ramirez, showing officers where the apartment was located, and arranging the law enforcement team for the buy. Ramirez did not have time, nor opportunity to meet with McIntosh and Masters to plan the set-up of Harris.

    2.  **Count Two**

Harris was charged in Count Two of the Indictment with Distribution of a Controlled Substance Resulting in Death. This charge involved the fatal overdose of Jordan Larry on September 1, 2015. Alexis Centers testified that she had been getting heroin from Jordan Larry since approximately June of 2015. It was a daily or every other day occurrence in which she would typically contact Jordan, be instructed where to pick him up, take him to meet the source, and give Jordan the money. He would then get the heroin from the source and give it to Centers. Typically, Centers would give Jordan "a pinch," as payment for hooking her up, and they would drive a short distance, stop, and shoot up. Centers also testified as to the locations where she and Jordan met the source, such as Motel 6 and near the Northport Hornbacher's in Fargo, much like other witnesses testified. Centers acknowledged not being able to identify the source, but noted he was often in a silver Chrysler 300 with dark tinted windows. She knew he was a black male

with curly hair or dreads. Additional circumstances of the vehicle have been previously set out above.

Zach Spieker was identified as being with Jordan at the time of the transaction with Centers on the evening of August 31, 2015, at the south Moorhead Dairy Queen. It was learned that Spieker and Jordan were together in the car at Stamart Liquors approximately an hour earlier that afternoon. This was all consistent with the surveillance video obtained from Stamart Liquors (Trial Ex. #16). The video showed a silver colored Chrysler 300 drive slowly through the lot at approximately 16:48 hours (4:48 pm), and exit out the east side. At 16:54 hours (4:54 p.m.) it appears the same Chrysler 300 comes back through the lot from the east, turns around the island where gas pumps once were, and goes back to the east before pulling into a parking area that is east of the building and just out of camera view. Approximately 20 seconds later a blue Ford Taurus pulls in from the east and parks in the area of the Chrysler 300. A minute and a half later the Chrysler is backing out and leaves through the lot going west. Less than 30 seconds after that, the blue Taurus leaves. The only entrance to the store is on the front of the building, and nobody can be seen coming from the east parking area into the store during the time the two cars are in the lot.

Detective Chris Martin also testified as to the Wisconsin license plate belonging to the vehicle Harris was driving a few weeks earlier when Deputy Canales had stopped Harris. The license plate on the car was identified as 964 XLE. A close look at the still photo from Stamart Liquor appears to be the same, or at least a partial match can be made out. (Trial Ex. #17).

There is additional corroborative information relative to this transaction. Call and text logs were subpoenaed for Jordan's cell phone. Agents could not get into Jordan's phone to obtain actual text content due to his security code. The relevant video from Stamart is from 4:48 pm on Aug 31st when the Chrysler 300 makes its first swing through the lot, until approximately 4:58 p.m. when both cars leave. The records indicated Jordan's phone had contact with Harris' phone (the number he gave Deputy Canales a month earlier) ten times (5 calls and 5 text messages) between 4:14 and 4:59 p.m. (Trial Ex. #8A and #9A). Also, in there at 4:16 is a call to Zach Spieker, the driver who took Jordan to Stamart Liquors. The contacts between the phones are consistent with the time of the meeting at Stamart. It is a reasonable inference from the other evidence in the case that Jordan met Harris and purchased heroin from him at that time.

There was also testimony from Dr. Mills, the medical examiner who conducted the autopsy on Jordan Larry. Dr. Mills testified that there was no injury, or other condition that would have caused Jordan's death, and concluded the cause of death was heroin toxicity.

The videos, cell records, testimony of Alexis Centers, testimony of Dr. Mills, and testimony from others that Harris was a source of  heroin for Jordan, though circumstantial evidence, was sufficient to sustain the jury's guilty verdict as to Count Two.

### 3. **Count Three**

Harris was charged in Count Three of the Indictment with Distribution of a Controlled Substance Resulting in Serious Bodily Injury. This charge involved the non-

fatal overdose of Tyler McIntosh on September 1, 2015. McIntosh testified that he and his girlfriend, Morgan Masters, started getting heroin from Harris in approximately the spring of 2015. He met Harris through Masters. Once they began to get heroin from Harris, he was the only one they obtained heroin from, except when Harris directed them to get it from James Smith, a/k/a "P" or Pete." On September 1, 2015, McIntosh obtained heroin from Harris directly or through Smith, and used in the bathroom of his residence that morning. On his way back to bed he collapsed, and the next thing he recalled was waking up with wires hanging from him. Masters had to call 911 and first responders had to administer Narcan to revive McIntosh. McIntosh testified about medical records from that incident, indicating that he was admitted to the hospital due to a heroin overdose and that he had not been breathing when 911 was called. (Trial Ex. 29). This incident was corroborated by the testimony of Morgan Masters as well. The testimony of Dr. Mills, the medical examiner for Jordan Larry's death, also indicated that Narcan will only be effective for a heroin overdose.

The testimony of McIntosh, Masters, Dr. Mills, and the medical records were sufficient to sustain the jury's guilty verdict as to Count Three.

### 4. **Count Five**

Harris was charged in Count Five of the Indictment with Distribution of a Controlled Substance Resulting in Serious Bodily Injury. This charge involved the non-fatal overdose of Morgan Masters on August 27, 2015. Masters testified that she had met Harris in the summer of 2015. Initially she began getting heroin from Harris' brothers, Willie and Brazil Midell, who told her it was coming from Harris or "Pooh." Shortly

thereafter, Masters began obtaining the heroin directly from Harris. Once that began, she only got her heroin from Harris, either directly or through his designee James Smith. Masters noted that whenever she got it she would share with McIntosh and vice versa. Masters, like several others, indicated she met at the Northport Hornbacher's parking lot or the Motel 6 in Fargo, as well as other locations.

On August 27, 2015, Masters and/or McIntosh obtained heroin from Harris, directly or via Smith, and used the heroin at the residence she shared with McIntosh. She was in the bathroom, shot up the heroin, and passed out. The next thing she knew she was in the parking lot with EMT's working on her. Masters was taken to Sanford Hospital where tests were conducted, indicating she had opiates in her system. Sanford Hospital records corroborate this testimony. Likewise, McIntosh testified and corroborated Masters regarding this incident. The heroin she used came from Harris, directly or through Smith. Masters testified she had not taken any other substance for several days prior to that overdose.

The testimony of Masters and McIntosh, and the medical records were sufficient to sustain the jury's guilty verdict as to Count Five.

5. **Count Six**

Harris was charged in Count Six of the Indictment with Distribution of a Controlled Substance. This charge involved the controlled purchase of heroin from Harris by Paul Ramirez on March 21, 2016. Testimony revealed that on March 21, 2016, Ramirez was arrested in Moorhead, Minnesota, attempting to sell methamphetamine to a person he thought was a friend, but was police officer. Thereafter, he agreed to assist law

enforcement with controlled buys of heroin from whom later turned out to be Harris. Ramirez gave them the location where Harris was staying, which was the apartment where McIntosh and Masters were residing. Ramirez had been staying with them until Harris arrived. Ramirez was then signed up as a CI, provided a recording/transmitting devise, and buy fund money. He went to the apartment and purchased one half gram of heroin from "Pooh," which he then turned over to officers.

Ramirez indicated in his testimony that the deal occurred as noted above, and that he gave the money to McIntosh who he believed gave it to Pooh. Pooh went into the bathroom and came out shortly thereafter, signaling to Ramirez that the heroin was ready in the bathroom. He retrieved it and left shortly thereafter. Ramirez testified about some of the discussion that occurred in the apartment during the buy. Harris claims Ramirez lacked credibility as none of the talk he testified about was on the audio. However, a closer listen to the audio shows a number of the items he mentioned are in fact on the recording. McIntosh and Masters corroborated the testimony of Ramirez that he came on that date and purchased heroin from Harris. The discrepancy in the testimony was that Masters thought Harris left the heroin on the stove for Ramirez. Task Force Officer Dan Heidbreder also testified and corroborated much of what took place on this occasion. The substance was sent to the lab for testing, and was in fact heroin.

The testimony of Ramirez, Heidbreder, Masters and McIntosh, the audio of the buy, and the lab results corroborate each other and were sufficient to sustain the jury's guilty verdict as to Count Six.

6. **Count Seven**

Harris was charged in Count Seven of the Indictment with Distribution of a Controlled Substance. This charge involved the controlled purchase of heroin from Harris by Paul Ramirez on March 22, 2016. Testimony related to this charge indicated virtually identical circumstances as the March 21st controlled buy. The difference was that Morgan Masters was not present for this transaction. Again, audio of the transaction was introduced into evidence, which, upon a closer listen, revealed matters Ramirez testified occurred in the apartment.

Approximately 30 minutes after the controlled buy on March 22nd, law enforcement executed a search warrant at the residence as noted in TFO Heidbreder's testimony as well as that of Tyler McIntosh and Jacob Wetch. Wetch and Katelyn Debardlabon had arrived after the buy and before the search warrant. Wetch testified he had just purchased heroin from Harris and shot up in the apartment prior to the search warrant. He said he hid the "kit" under the couch when officers arrived.

Again, TFO Heidbreder corroborated much of the testimony of Ramirez, McIntosh, and Wetch as to what took place on this date. In addition to the buy, TFO Heidbreder testified about the search warrant executed at the apartment shortly after the buy. TFO Heidbreder noted that law enforcement provided Ramirez with "buy funds" for which he had previously recorded the serial numbers and denominations. (Trial Ex.'s 34-36). During the search warrant, $460 of the total $500 in buy funds from the two buys was located. It was in a basket of toys in the living room area of the residence. This is where Ramirez and McIntosh had stated Harris was at the time the deal started and

concluded. Significantly, located in the same basket next to the cash from the buys was Harris' Wisconsin identification card. (Trial Ex. #33). The money was folded, and next to the identification as though it had all been quickly taken out of Harris' pocket and tossed into the basket so as not to be found on his person by the officers who were knocking on the door.

The testimony of Ramirez, Heidbreder, and McIntosh, the audio of the buy, the lab results, and the items seized at the ensuing search warrant corroborate each other and were sufficient to sustain the jury's guilty verdict as to Count Seven.

While the evidence as outlined herein is sufficient to find the defendant guilty of the various offenses for which the jury returned guilty verdicts, the United States must address the defendant's assertion that the witnesses were biased and unreliable. Clearly, there were matters that the witnesses testified to that were in some ways inconsistent with each other. However, it is not evident from those inconsistencies that the witnesses were lying. Different recollections or perspectives on particular incidents do not equate to lies. If the Court gets to the point of addressing credibility of the witnesses as set forth by the defendant, it should be clear that most of the material information is actually consistent. Further, it should be clear from a review of the testimony, and the timeline involved, that most of the witnesses were interviewed initially by law enforcement prior to any deals, consideration, or immunity. They merely reiterated these statements, and gave additional details after being advised they were not being charged, or after going through the State system.

Further, the defendant had, and took every opportunity to impeach witnesses with these inconsistencies, prior records, biases, and any consideration they received. The jury, after weighing all of the evidence, still found the defendant guilty as to six of the seven counts, believing the evidence proved the charges beyond a reasonable doubt. Again, we don't know what weight the jury gave to the various pieces of evidence, but they did piece together the testimony, phone and medical records, videos, and other pieces of the case, and distinguish what they believed was proof beyond a reasonable doubt on six charges, from what they determined was insufficient proof on the remaining charge. Significant thought and consideration went into the jury's deliberations, and their determinations, as evidenced by their acquittal of Harris on Count Four, should not be disregarded. Furthermore, the jury only needed to find the essential elements proven beyond a reasonable doubt. If one were to accept that there were some inconsistencies in the testimony as to what occurred, as argued by Harris, he still has failed to show that any inconsistencies were with respect to one or more of the essential elements as instructed by the Court. Therefore, he has provided no basis upon which the Court can determine that a miscarriage of justice has occurred, and the jury's verdict must stand.

## Conclusion

Based upon the foregoing, the defendant's motions under Rule 29 and Rule 33 should be denied.

Dated: June 27, 2018

CHRISTOPHER C. MYERS
United States Attorney

By:    */s/ Brett M. Shasky*_____
BRETT M. SHASKY
Assistant United States Attorney
Quentin N. Burdick United States Courthouse
655 First Avenue North - Suite 250
Fargo, ND  58102-4932
(701) 297-7400
ND Bar Board ID No. 04711
Brett.Shasky@usdoj.gov
Attorney for United States